## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JENNIE ROSA LEE ECKENRODE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 18-1927-CFC-SRF |
| | ) |
| ANDREW SAUL,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

Plaintiff Jennie Rosa Lee Eckenrode ("Eckenrode") filed this action on December 5,

2018 against the defendant Andrew Saul, the Commissioner of the Social Security

Administration (the "Commissioner"). Eckenrode seeks judicial review pursuant to 42 U.S.C. §

405(g) of the Commissioner's October 15, 2018 final decision, denying Eckenrode's claims for

disability insurance benefits ("DIB"), supplemental security income ("SSI"), and disabled

widow's benefits ("DWB") under Titles II and XVI of the Social Security Act (the "Act"), 42

U.S.C. §§ 401–434 and §§ 1381–1383f.

Currently before the court are cross-motions for summary judgment filed by Eckenrode

and the Commissioner.[2]  (D.I. 11; D.I. 13)  Eckenrode asks the court to remand her case for

further administrative proceedings. (D.I. 12 at 15)  The Commissioner requests the court affirm

---

[1] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019 to succeed
Acting Commissioner Nancy A. Berryhill. Pursuant to Federal Rule of Civil Procedure 25(d)
and 42 U.S.C. § 405(g), Andrew Saul was automatically substituted as the Defendant in this
action.

[2] The briefing for the present motions is as follows: Eckenrode's opening brief (D.I. 12), the
Commissioner's combined opening brief in support of his motion for summary judgment and
answering brief (D.I. 14), and Eckenrode's reply brief (D.I. 16).

the Administrative Law Judge's ("ALJ") decision. (D.I. 14 at 14-15) For the reasons set forth below, the court recommends denying Eckenrode's motion for summary judgment (D.I. 11) and granting the Commissioner's cross-motion for summary judgment (D.I. 13).

## II. BACKGROUND

### A. Procedural History

Eckenrode filed a SSI application on December 30, 2013,[3] a DIB application on January 29, 2014,[4] and a DWB application on October 7, 2015, claiming a disability onset date of May 31, 2009 for all of these applications. (D.I. 9-6 at 7-16, 19-21) Her claim was initially denied on July 28, 2014, and denied again after reconsideration on October 6, 2014. (D.I. 9-4 at 5-16, 18-29) Eckenrode then filed a request for a hearing, which occurred on October 13, 2017. (*Id.* at 30-31; D.I. 9-2 at 62-90) At the hearing before the ALJ, Eckenrode amended her alleged onset date to October 1, 2013. (D.I. 9-2 at 64; D.I. 9-8 at 22) Administrative Law Judge Jerry Faust issued an unfavorable decision, finding that Eckenrode was not disabled under the Act on December 6, 2017. (D.I. 9-2 at 36-46) The Appeals Council subsequently denied Eckenrode's request for review on October 15, 2018, rendering the ALJ's decision the final decision of the Commissioner. (*Id.* at 2-4)

On December 5, 2018, Eckenrode brought a civil action in this court challenging the ALJ's decision. (D.I. 2) On May 16, 2019, Eckenrode filed a motion for summary judgment, and on July 22, 2019, the Commissioner filed a cross-motion for summary judgment. (D.I. 11; D.I. 13)

---

[3] The ALJ noted that Eckenrode filed this application on January 31, 2014, but the application is dated December 30, 2013. (D.I. 9-2 at 36; D.I. 9-6 at 7-14)

[4] The ALJ noted that Eckenrode filed this application on January 28, 2014, but the application is dated January 29, 2014. (D.I. 9-2 at 36; D.I. 9-6 at 15-16)

2

## B. Medical History

Eckenrode was born on February 11, 1964 and was 49 years old on her amended alleged disability onset date. (D.I. 9-2 at 36, 44) Eckenrode attended school through the ninth grade, but did not graduate from high school. (*Id.* at 68) She has a prior work history as a meat wrapper and delicatessen counter worker. (*Id.* at 44, 68-69, 71) The ALJ concluded that Eckenrode had the following severe impairments: stage II chronic kidney disease with history of renal cell carcinoma, status-post removal of the left kidney and partial nephrectomy on the right; hypertension; lumbar degenerative disc disease; cervical degenerative disc disease status-post fusion; history of right carpal tunnel release; anxiety; and depression. (*Id.* at 39)

On October 1, 2013, Eckenrode visited St. Francis Hospital Emergency Center for an injury to her head, neck, and right elbow after an alleged assault by two men on September 30, 2013. (D.I. 9-15 at 36; D.I. 9-17 at 16) She received a CT scan of her face, brain, right elbow, and cervical spine. (D.I. 9-12 at 63-68) These CT scans showed a zygomaticomaxillary complex fracture of her right face, small joint effusion in her right elbow, no acute intracranial abnormality, and no evidence of cervical spine facture or subluxation. (*Id.*) On October 10, 2013, Eckenrode underwent an orbital surgery to reconstruct her right orbital floor and fix the complex fracture on the right side of her face. (D.I. 9-17 at 45-50) Upon discharge, Eckenrode was directed to rest with her head elevated and to abstain from heavy lifting, overhead lifting, driving, and blowing her nose. (D.I. 9-12 at 72)

On October 31, 2013, Eckenrode attended a follow-up appointment with Dr. Nini Aung ("Dr. Aung") and reported facial pain, elbow pain, back pain, and headaches. (*Id.* at 69) Dr. Aung observed Eckenrode's full muscle strength, but acknowledged tenderness in her lower back, right zygomaxillary, and right elbow. (*Id.* at 70) Dr. Aung also noted a restricted range of

3

motion at Eckenrode's right elbow. (*Id.*) On the same day, Eckenrode received medical imaging of her lumbar spine, which showed slight scoliosis and mild to moderate generalized spondylotic and osteoarthritic changes. (D.I. 9-13 at 57)

On January 2, 2014, Eckenrode received a CT scan of her abdomen and pelvis, revealing a 2.5 cm mass on her right kidney, which Dr. Jeffrey D. Steinig ("Dr. Steinig") opined was suspicious for renal cell carcinoma. (*Id.* at 59) On January 17, 2014, Eckenrode visited Dr. Francis J. Schanne ("Dr. Schanne"), who suggested a right partial nephrectomy[5] to avoid dialysis. (*Id.* at 90) On January 24, 2014, Eckenrode visited Dr. Brian P. McDonough ("Dr. McDonough") for pre-operative clearance before her right partial nephrectomy. (D.I. 9-12 at 80; D.I. 9-19 at 2) Five days later, Eckenrode underwent a right partial nephrectomy. (D.I. 9-13 at 71, 73)

On February 12, 2014, Eckenrode attended a follow-up appointment with Dr. Schanne, who noted that Eckenrode experienced tenderness over her port sites and in her right flank. (*Id.* at 81) On February 20, 2014, Eckenrode filled out a pain questionnaire, wherein she described a constant, sharp, and aching pain on her right side, knees, and back which was worse in the evenings. (D.I. 9-9 at 38) She noted that it hurt to walk and that she was afraid to bend over due to pain. (*Id.* at 39) She described a typical day as showering and propping up her legs to rest as much as possible. (*Id.* at 40) She stated that she can make her bed, do laundry, take care of her personal hygiene, and pay attention for five minutes. (*Id.* at 41-42, 45) She stated that her

---

[5] A radical nephrectomy is a removal of the entire kidney and often some additional structures, such as the ureter, adrenal gland, or lymph nodes. *See Nephrectomy (Kidney Removal)*, MAYO CLINIC, https://www.mayoclinic.org/tests-procedures/nephrectomy/about/pac-20385165 (last visited Jan. 28, 2020). In a partial nephrectomy, the diseased tissue from a kidney is removed while healthy tissue remains. *See id.* Prior to the amended alleged onset date, on January 24, 2007, Eckenrode underwent a left radical nephrectomy. (D.I. 9-13 at 81)

4

hobbies included reading, watching television, and sewing. (*Id.* at 44) Eckenrode noted that she participates in monthly community service. (*Id.*) However, Eckenrode noted that she could not work, lift, drive, or do housework or yardwork. (*Id.* at 41-43) She reported that she cannot follow written or spoken instructions well and does not handle stress well. (*Id.* at 45-46) Due to reported forgetfulness, she stated that she cannot pay bills, handle a savings account, or use a checkbook or money orders. (*Id.* at 43-44)

On March 4, 2014, Eckenrode visited St. Francis Hospital Emergency Center, complaining of pain in her back, right flank, chest, abdomen, and right elbow. (D.I. 9-15 at 21) She received CT scans of her right elbow, chest, abdomen, pelvis, cervical spine, and head. (D.I. 9-14 at 4-8) These CT scans revealed no acute fracture in her right elbow, no acute post-traumatic abnormalities, no acute fracture or listhesis, and no acute intracranial abnormality. (*Id.*) However, the CT scan of her head showed extensive paranasal sinus disease. (*Id.* at 8)

On March 10, 2014, Eckenrode visited Dr. Mary McCrossan ("Dr. McCrossan") for persistent, aching elbow pain after a recent fall. (D.I. 9-19 at 4) On March 13, 2014, Eckenrode visited Dr. Andrew J. Gelman ("Dr. Gelman") to follow up regarding the injury to her elbow. (D.I. 9-17 at 60) Dr. Gelman noted that she had a range of motion in her elbow of fifteen to ninety degrees and encouraged physical therapy to increase this range of motion. (*Id.*) Three days later, Eckenrode visited St. Francis Hospital Emergency Center for urinary frequency and back pain exacerbated by movement. (D.I. 9-15 at 9) On March 27, 2014, Eckenrode visited Dr. Hugh Bonner ("Dr. Bonner"), complaining of a swollen lip and headaches. (D.I. 9-14 at 42-43) Dr. Bonner discharged Eckenrode and advised that if she experienced difficulty swallowing or breathing, nausea, vomiting, or chest pain, she should return to the hospital immediately. (*Id.* at 43)

On May 13, 2014, Eckenrode visited Dr. J. Douglas Patterson ("Dr. Patterson") and reported pain in her right elbow. (D.I. 9-17 at 58-59) Dr. Patterson noted a full range of motion in her right elbow, forearm, and fingers. (*Id.*) Two days later, she returned to Dr. Patterson, complaining of persistent numbness and tingling in her right hand and elbow pain. (*Id.* at 57) Dr. Patterson opined that Eckenrode suffered from significant carpal and cubital tunnel syndrome. (*Id.*) On May 21, 2014, Eckenrode visited St. Francis Hospital Emergency Center with poor appetite, nausea, diarrhea, pain with urination, headaches, abdominal pain, and flank pain. (D.I. 9-14 at 76, 82) She received a CT scan of her head, which showed no acute intracranial abnormality. (D.I. 9-18 at 33) Two days later, Eckenrode returned to St. Francis Hospital Emergency Center with swelling to the right side of her face. (D.I. 9-17 at 7) She received a CT scan of her head, which showed no acute post-traumatic injury. (*Id.* at 39) On May 29, 2014, Eckenrode underwent right carpal tunnel release and right ulnar nerve release operations. (*Id.* at 62)

On June 19, 2014, Eckenrode visited Dr. McDonough and complained of urinary hesitancy and pain with urination. (D.I. 9-19 at 6) On July 17, 2014, Eckenrode visited Dr. Steinig, who performed a CT scan of her abdomen. (D.I. 9-18 at 29) This CT scan showed status post resection of right renal mass with nonspecific hypodense tissue. (*Id.*) Dr. Steinig observed that there was no evidence of metastatic disease. (*Id.* at 30) Eckenrode returned to Dr. McDonough on July 25, 2014, reporting knee pain, back pain, and urinary frequency. (D.I. 9-19 at 9)

On July 28, 2014, Dr. Michael H. Borek ("Dr. Borek")[6] stated that Eckenrode had not cooperated with Disability Determination Services ("DDS") or her attorney regarding her current

---

[6] Dr. Borek is a state agency medical consultant. (D.I. 9-3 at 9)

and past medical treatment. (D.I. 9-3 at 9) Therefore, Dr. Borek concluded that he had insufficient evidence to make any findings regarding her impairments, but was able to note Eckenrode's major joint dysfunction, chronic renal failure, and affective disorders. (*Id.* at 9-10) On August 11, 2014, Eckenrode attended a follow-up appointment with Dr. Schanne, who noted high blood pressure and tenderness over her port sites, right flank, hips, and joints. (D.I. 9-18 at 57) Eckenrode reported that she experienced pain after urination, urinary frequency, and incontinence with stress. (*Id.*) Dr. Schanne recommended physical therapy to help retrain her pelvic floor. (*Id.* at 59) The same day, Eckenrode visited Dr. Philip S. Schwartz ("Dr. Schwartz") for a rheumatology evaluation. (*Id.* at 62-63) Dr. Schwartz noted that Eckenrode experienced joint pains, leg cramps, and hip pains. (*Id.* at 62) On September 18, 2014, Dr. Jose Acuna ("Dr. Acuna")[7] stated that plaintiff failed to respond regarding her current impairments and that the available evidence was insufficient to determine the severity of her impairments. (D.I. 9-3 at 31-34) Nonetheless, Dr. Acuna noted major joint dysfunction, chronic renal failure, and affective disorders. (*Id.* at 32)

On October 22, 2014, Eckenrode visited Dr. Khine Min ("Dr. Min") for gradually worsening hypertension. (D.I. 9-19 at 11) Dr. Min noted that Eckenrode was not following a special diet or participating in an exercise program. (*Id.*) Eckenrode reported a dull aching low back pain that radiated to the lateral aspect of her legs and was aggravated by bending, twisting, lifting, standing, and walking. (*Id.*) Dr. Min observed normal strength, tone, sensation, posture, and gait. (*Id.*) On December 3, 2014, Eckenrode visited Dr. Bonner, complaining of an overactive bladder. (D.I. 9-19 at 14) Two days later, she underwent an abdominal exam, which showed that hypoattenuating tissue in the lower pole of her right kidney had decreased in size,

---

[7] Dr. Acuna is a state agency medical consultant. (D.I. 9-3 at 34)

suggesting post-operative changes rather than recurrent disease. (D.I. 9-18 at 28) On December 18, 2014, Eckenrode visited St. Francis Hospital Emergency Center with elevated blood pressure and back pain, but denied experiencing headaches. (*Id.* at 2) The next day, she visited Dr. Bonner, who noted gradually worsening hypertension. (D.I. 9-19 at 15) Eckenrode stated that she did not follow a special diet, but had started to exercise daily. (*Id.*) On May 25, 2015, Eckenrode visited Dr. Milana Ellison ("Dr. Ellison"), who noted gradually improving hypertension. (D.I. 9-12 at 40) On August 27, 2015, Eckenrode received an ultrasound of her retroperitoneum, which showed moderate bilateral pelvocaliectasis.[8] (D.I. 9-19 at 78) In late 2015, Eckenrode became homeless and medication noncompliant. (*Id.* at 21)

On August 9, 2017, Eckenrode visited Dr. Arthur Dermen ("Dr. Dermen") and reported elevated blood pressure, headache, blurred vision, difficulty urinating, and right flank pain. (*Id.*) Dr. Dermen observed no facial droop and no focal weakness of her extremities. (*Id.*) Dr. Dermen noted that Eckenrode had been medication noncompliant and referred her to St. Francis Hospital Emergency Center. (*Id.* at 21, 40) On the same day, Eckenrode was admitted into St. Francis Hospital Emergency Center, where she received CT scans of her abdomen, pelvis, head, and brain. (*Id.* at 40, 56-58) These CT scans showed no acute findings, no gross evidence for recurrent or residual malignancy in her kidney, and no acute intracranial abnormality. (*Id.* at 56-58) The CT scan of her head showed signs of paranasal sinus disease. (*Id.* at 58) Her hypertension symptoms of headaches, blurred vision, slurred speech, and facial droop resolved after eight hours. (*Id.* at 40-41) The next day, Eckenrode underwent a carotid ultrasound, which

---

[8] Caliecasis is a condition in which the calyces become dilated and swollen. *See Caliectasis*, HEALTHLINE (Nov. 3, 2017), https://www.healthline.com/health/kidney-health/caliectasis.

indicated a transient ischemic attack ("TIA").[9] (*Id.* at 54) She also received a two-dimensional transthoracic echocardiogram, which showed mild concentric left ventricular hypertrophy.[10] (*Id.* at 60) She was subsequently discharged from the hospital. (*Id.* at 41)

Five days later, Eckenrode was admitted into St. Francis Hospital Emergency Center for high blood pressure, facial swelling, shortness of breath, lightheadedness, hearing loss, and blurry vision. (*Id.* at 68) She was discharged on the same day. (*Id.*) On September 5, 2017, Eckenrode visited Dr. Manthodi Faisal ("Dr. Faisal"), who noted that she had been medication compliant since her release from the hospital and that her blood pressure was well-controlled. (*Id.* at 81-82) Eckenrode complained of intermittent dizziness, lightheadedness, and overactive bladder with increased urinary frequency. (*Id.* at 81) On September 25, 2017, Eckenrode visited Dr. Michael Chiusano ("Dr. Chiusano") and complained of right lower quadrant abdominal pain, but denied any urinary complaints. (*Id.* at 33)

In an undated and unsigned medical report, Dr. Dermen opined that Eckenrode could occasionally lift five to ten pounds in a workday, stand three to four minutes at one time, walk half of a block without stopping, and sit for seven to eight minutes at one time. (*Id.* at 71) He noted that Eckenrode could remain at her workstation for ten to fifteen minutes, but would need to recline, lie down, or elevate her feet to hip level or higher four times daily for approximately

---

[9] A transient ischemic attack ("TIA") produces similar symptoms to a stroke, but lasts only a few minutes and causes no permanent damage. *See Transient Ischemic Attack (TIA),* MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/transient-ischemic-attack/symptoms-causes/syc-20355679 (last visited Jan. 28, 2020).

[10] Left ventricular hypertrophy is the enlargement and thickening of the heart's main pumping chamber. *See Left Ventricular Hypertrophy,* MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/left-ventricular-hypertrophy/symptoms-causes/syc-20374314 (last visited Jan. 28, 2020).

three to four hours at one time. (*Id.*) Furthermore, he opined that Eckenrode could frequently reach and finger, and occasionally handle objects. (*Id.*)

### C. Hearing Before ALJ Faust

#### 1. Eckenrode's Testimony

Eckenrode testified that she currently lives alone in a trailer. (D.I. 9-2 at 67) She stated that she was homeless for a period of eighteen months starting in approximately 2013.[11] (*Id.*) During this period, her medical insurance lapsed, but has since been reinstated. (*Id.* at 67-68) Eckenrode testified that she worked in a supermarket delicatessen and eventually became a meat wrapper. (*Id.* at 68)

Eckenrode stated that she had kidney cancer, which resulted in the removal of her left kidney in 2007 and the removal of ninety percent of her right kidney in 2014. (*Id.* at 71-72) Eckenrode testified that she wears a diaper, urinates frequently, and experiences nighttime incontinence. (*Id.* at 73) She experiences fatigue, nausea, and dizziness. (*Id.* at 74) She testified that she is currently seeing Dr. Dermen for her high blood pressure, bipolar disorder, and diabetes. (*Id.* at 77) She stated that Dr. Dermen has referred her to a kidney specialist, gynecologist, and urologist. (*Id.*)

Eckenrode testified that it is difficult for her to complete household chores, but she is able to put things in her trashcan and pick up around the house. (*Id.* at 80) Her son takes out the trash, mows the lawn, and does yardwork. (*Id.*) Her niece cleans her house weekly. (*Id.* at 80-81) Eckenrode testified that she is scared to drive because her vision is poor and she has difficulty "judg[ing] things." (*Id.* at 81) She testified that she does not think that she could

---

[11] In the hearing before the ALJ, Eckenrode was unsure as to whether she became homeless in 2013 or 2015. (D.I. 9-2 at 67) The record shows that she became homeless in 2015. (D.I. 9-19 at 21)

perform her previous work because sitting and standing would bother her back and legs. (*Id.* at

82) She testified that her incontinence would be another stressor that would make work difficult.

(*Id.*)

## 2. Vocational Expert Testimony Before the ALJ

The ALJ posed the following hypothetical to the vocational expert ("VE"):

Let's assume we have a person that's 50 to 53 years old; they have a ninth-grade
education. Assume they have an exertional capacity for light work as defined by
the Department of Labor and the Commissioner of Social Security . . . . They can
frequently, but not constantly, handle and finger on the right; they can
occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; they
can't do any dangerous balancing, such as on beams; but they can otherwise
occasionally balance, stoop, kneel, crouch, and crawl. They can have no more
than occasional exposure to vibration, and they also must avoid exposure to
hazards such as unprotected heights, dangerous unshielded machinery, open
water, commercial driving. They can perform simple, routine tasks in a relatively
static environment with infrequent changes. They can have superficial interaction
with others. By superficial I mean no negotiation, no confrontation, no
arbitration, no mediation, and no supervision of others, and no persuasion of
others. Could such a person perform any of the claimant's past work, either as
she performed it or as generally performed in the national economy?

(*Id.* at 86) The VE testified that this individual would not be able to perform any of claimant's

past work, but could perform other jobs that exist in the national economy, such as the work of a

garment folder, small products assembler, and inspector and hand packer, all at the light

exertional level. (*Id.* at 87) The ALJ then inquired whether being "off task" for fifteen percent

of the workday or work week would affect this individual's ability to be employed. (*Id.*) The

VE testified that there would be no work for that individual. (*Id.* at 88) The ALJ asked whether

missing work twice a month, being late twice a month, having to leave early twice a month, or

any combination of these three scenarios would affect this individual's ability to be employed.

(*Id.*) The VE testified that such an individual would not be able to sustain competitive

employment. (*Id.*)

**D. The ALJ's Findings**

Based on the factual evidence in the record and the testimony by Eckenrode and the VE,

the ALJ determined that Eckenrode was not disabled under the Social Security Act for the

relevant time period of October 1, 2013, the amended alleged onset date of the disability, through

December 6, 2017, the date of the decision. (*Id.* at 36-46) The ALJ found in pertinent part:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2014.

2. It was previously found that the claimant is the unmarried widow of the deceased insured worker and has attained the age of 50. The claimant met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act.

3. The prescribed period ends on August 31, 2022.

4. The claimant has not engaged in substantial gainful activity since May 31, 2009, the original alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

5. The claimant has the following severe impairments: stage II chronic kidney disease with history of renal cell carcinoma, status-post removal of the left kidney and partial nephrectomy on the right; hypertension; lumbar degenerative disc disease; cervical degenerative disc disease status-post fusion; history of right carpal tunnel release; anxiety; and depression. (20 CFR 404.1520(c) and 416.920(c)).

6. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

7. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following nonexertional limitations: frequently handle and finger on the right; occasionally climb ramps and/or stairs; never climb ladders, ropes, or scaffolds; never perform dangerous balancing, such as on beams, but otherwise occasionally balance; occasionally stoop, kneel, crouch, or crawl; occasionally be exposed to vibration; avoid exposure to hazards, such as unprotected heights, dangerous unshielded machinery, open water, and commercial driving; perform simple, routine, and repetitive tasks in a

relatively static environment with infrequent changes; and interact with others on a superficial basis. Superficial is defined as not requiring negotiation, confrontation, mediation, arbitration, supervision of other others [*sic*], or persuasion of others.

8. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

9. The claimant was born on February 11, 1964 and was 45 years old, which is defined as an individual closely approaching advanced age, on the original alleged disability onset date (20 CFR 404.1563 and 416.963).

10. The claimant has a limited education and communicates in English (20 CFR 404.1564 and 416.964).

11. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

12. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

13. The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2013, the amended alleged onset date, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(*Id.* at 39-45)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if

they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (2015).

Judicial review of the ALJ's decision is limited to determining whether "substantial evidence"

supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).

In making this determination, a reviewing court may not undertake a de novo review of the

ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the

reviewing court would have decided the case differently, the court must affirm the ALJ's decision if it is supported by substantial evidence. *See id.* at 1190-91.

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (quoting *Jesurum v. Sec'y of the U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). As the United States Supreme Court has explained, substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted).

Thus, in the context of judicial review under § 405(g):

[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of a claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefits cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g)

affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the [Commissioner] for a rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

The core issue in this case is whether Eckenrode was disabled within the meaning of the Act at any time from October 1, 2013, the amended alleged onset date, through the date of the ALJ's decision, December 6, 2017. (D.I. 9-2 at 45)  Title II of the Social Security Act affords insurance benefits "to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (citing 42 U.S.C. § 423(a)(l)(D) (2015)).  A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(l)(A).  A claimant is only disabled if his impairments are so severe that he is unable to do his previous work or engage in any other kind of substantial gainful work existing in the national economy. *See id.* § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).  To qualify for disability insurance benefits, a claimant must establish that he was disabled prior to the date he was last insured. *See* 20 C.F.R. § 404.131 (2016); *Matullo*, 926 F.2d at 244.

The Commissioner must perform a five-step analysis to determine whether a particular claimant has met his burden of establishing disability. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999).  If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)(i).  At step one, the

15

Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to step four and five. *See id.* §§ 404.1520(e), 416.920(e).

At step four, the ALJ considers whether the claimant retains the residual functional capacity (the "RFC") to perform his past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428.

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude him from adjusting to any

other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled. *See id.* The ALJ often seeks the VE's assistance in making this finding. *See id.*

## B. Whether the ALJ's Decision is Supported by Substantial Evidence

On December 6, 2017, the ALJ found that Eckenrode was not disabled from the amended alleged disability onset date of October 1, 2013, through the date of the ALJ's decision. (D.I. 9-2 at 45) The ALJ concluded that, despite Eckenrode's severe impairments (stage II chronic kidney disease with history of renal cell carcinoma, status-post removal of the left kidney and partial nephrectomy on the right; hypertension; lumbar degenerative disc disease; cervical degenerative disc disease status-post fusion; history of right carpal tunnel release; anxiety; and depression), Eckenrode had the RFC to perform work at the light exertional level with the following limitations: frequently handle and finger on the right; occasionally climb ramps and/or stairs; never climb ladders, ropes, or scaffolds; never perform dangerous balancing, such as on beams, but otherwise occasionally balance; occasionally stoop, kneel, crouch, or crawl; occasionally be exposed to vibration; avoid exposure to hazards, such as unprotected heights, dangerous unshielded machinery, open water, and commercial driving; perform simple, routine, and repetitive tasks in a relatively static environment with infrequent changes; and interact with

17

others on a superficial basis.[12] (*Id.* at 39, 41) Eckenrode asserts three main arguments on appeal: (1) the ALJ failed to provide adequate reasons for affording Dr. Dermen's medical opinion "limited weight" and the ALJ's RFC finding was therefore inaccurate, (2) the ALJ's hypothetical to the VE failed to describe all of her impairments, and (3) the ALJ's discussion of the medical evidence of record included "significant gaps." (D.I. 12 at 4-15)

## 1. The ALJ Properly Evaluated Medical Opinion Evidence

Eckenrode argues that the ALJ failed to provide adequate reasons for assigning the opinion of her treating physician, Dr. Dermen, "limited weight." (*Id.* at 4-13) Specifically, Eckenrode contends that the ALJ failed to consider all relevant factors outlined in 20 C.F.R. § 404.1527 when assigning weight to Dr. Dermen's opinion. (*Id.* at 4-6, 8-9) These factors include: examining relationship, treatment relationship, supportability, consistency, specialization, and other factors such as the extent to which the medical source is familiar with other information in the case. *See* 20 C.F.R. § 404.1527(c); SSR 96-2p.[13] Eckenrode also suggests that the ALJ failed to provide good, specific, and supported reasons for rejecting Dr. Dermen's opinion and, instead, substituted his own lay opinion in affording Dr. Dermen's opinion limited weight. (D.I. 12 at 7-8, 12-13)

Although the findings and opinions of treating physicians are entitled to substantial weight, "'[t]he law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity.'" *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir.

---

[12] The ALJ defined "superficial" as "not requiring negotiation, confrontation, mediation, arbitration, supervision of other others [*sic*], or persuasion of others." (D.I. 9-2 at 41)
[13] 20 C.F.R. § 404.1527 has recently been amended, but the court analyzes this regulation as it was at the time of the ALJ's decision. *See* 20 C.F.R. § 404.1527. SSR 96-2p was rescinded on March 27, 2017, but plaintiff's claim was filed prior to this effective date. (D.I. 9-6 at 7-16, 19-21) *See* SSR 96-2p.

18

2011) (quoting *Brown v. Astrue*, 649 F.3d 193, 197 n.2 (3d Cir. 2011)). Instead, the

determination of RFC and disabilities are issues reserved for the Commissioner. *See* 20 C.F.R. §

416.927(d)(2). Moreover, "[a] treating source's opinion is not entitled to controlling weight if it

is 'inconsistent with other substantial evidence in [the] case record.'" *Scouten v. Comm'r of Soc.

Sec.*, 722 F. App'x 288, 290 (3d Cir. 2018) (quoting 20 C.F.R. § 404.1527(c)(2)). It is not for

the court to re-weigh the medical opinions in the record, but rather to "determine whether

substantial evidence exists to support the ALJ's weighing of those opinions." *Ransom v.

Berryhill*, C.A. No. 17-939-LPS, 2018 WL 3617944, at *7 (D. Del. July 30, 2018) (citing

*Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 659 (D. Del. 2008)).

In determining an individual's RFC, the ALJ is "free to accept some medical evidence

and reject other evidence" so long as she "provides an explanation for discrediting the rejected

evidence." *Zirnsak v. Colvin*, 777 F.3d 607, 614 (3d Cir. 2014). The ALJ may also reject a

treating physician's opinion outright based on contrary medical evidence and may assign a

"treating physician's opinion more or less weight depending upon the extent to which supporting

explanations are provided." *Plummer*, 186 F.3d at 429 (quoting *Newhouse v. Heckler*, 753 F.2d

283, 286 (3d Cir. 1985)).

Here, the ALJ assigned the opinion of Dr. Dermen "limited weight." (D.I. 9-2 at 44) The

ALJ did not explicitly identify Dr. Dermen as Eckenrode's treating physician. (*Id.*) Defendant

argues that, aside from a hypertension check on August 9, 2017, Dr. Dermen's undated and

unsigned report marks the only visit Eckenrode had with Dr. Dermen based upon the medical

evidence of record. (D.I. 9-19 at 21, 71) The ALJ asserted that Dr. Dermen's restrictive

limitations of lifting up to ten pounds occasionally, sitting three to four minutes at one time, and

sitting seven to eight minutes at one time were inconsistent with the evidence of record. (D.I. 9-

2 at 44) The ALJ explained that Eckenrode reported her activities of daily living and social activities, which included monthly community service and performing personal care tasks. (*Id.*; D.I. 9-9 at 41-42, 44) The ALJ recognized that Eckenrode's hypertension was well-controlled when she was medication compliant and that her carpal tunnel symptoms have been alleviated by her carpal tunnel release surgery. (D.I. 9-2 at 43) Furthermore, the ALJ acknowledged that following Eckenrode's right partial nephrectomy, she did not require further treatment for renal cell carcinoma. (*Id.*) The ALJ stated that Eckenrode reported urinary frequency throughout 2014, but did not seek further treatment from a urologist until September 25, 2017. (*Id.*; D.I. 9-19 at 33) Moreover, the ALJ noted that the medical evidence of record shows normal strength, posture, gait, and coordination. (D.I. 9-2 at 43; D.I. 9-12 at 70; D.I. 9-19 at 13, 21) Therefore, substantial evidence supports the ALJ's decision to assign limited weight to Dr. Dermen's opinion.

Eckenrode also argues that by rejecting Dr. Dermen's opinion, the ALJ impermissibly substituted his own lay judgment for the opinion of a medical expert. (D.I. 12 at 12) An ALJ is not bound to accept the opinion of a medical expert, but may weigh the medical evidence and draw his or her own inferences. *See Kertesz v. Crescent Hills Coal Co.*, 788 F.2d 158, 163 (3d Cir. 1986); *Brown*, 649 F.3d at 196. However, the ALJ may not exercise absolute discretion to credit and discredit the expert's medical evidence, or to substitute his or her own lay judgment for the opinions of a medical expert. *See Kertesz*, 788 F.2d at 163. Here, the ALJ did not substitute his own lay judgment for Dr. Dermen's opinion, but rather noted that his opinion was inconsistent with the evidence of record and Eckenrode's allegations regarding her abilities. (D.I. 9-2 at 44)

Eckenrode asserts that because Dr. Dermen provided the only medical opinion regarding her limitations, the ALJ's decision to discredit Dr. Dermen's opinion is necessarily indicative of a substitution of his lay opinion and undermines his analysis. (D.I. 12 at 6-8, 12-13) Plaintiff notes that the ALJ afforded Dr. Borek and Dr. Acuna's opinions no weight because they had insufficient evidence to assess her abilities and limitations. (*Id.* at 6-7; D.I. 9-2 at 44; D.I. 9-3 at 9-10, 31-34) She cites *Morales v. Apfel* to support this contention, but *Morales* is distinguishable from this case. (D.I. 12 at 7) *See also Morales v. Apfel*, 225 F.3d 310 (3d Cir. 2000). In *Morales*, the Third Circuit concluded that the ALJ had impermissibly substituted his own lay opinion because he relied on his own observations of the claimant to reject medical opinions of record. *Morales*, 225 F.3d at 318. However, the Third Circuit has held that rejecting a treating physician's opinion that is unsupported by the medical evidence of record and a claimant's testimony regarding her daily activities is proper. *See Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 202 (3d Cir. 2008) (concluding that portions of treating physician's testimony were not entitled to controlling weight because they were inconsistent with other substantial evidence in the record); *Colvin v. Comm'r of Soc. Sec.*, 675 F. App'x 154, 157 (3d Cir. 2017) (ALJ properly afforded less weight to treating physician because his opinion was not supported by medical records); *Russo v. Astrue*, 421 F. App'x 184, 191 (3d Cir. 2011) (concluding that treating physician's opinion should not be afforded controlling weight because it was inconsistent with other substantial evidence in the case record, "particularly [claimant's] list of daily activities").

The ALJ set forth valid reasons for according Dr. Dermen's opinion "limited weight" and, therefore, the court recommends denying Eckenrode's motion for summary judgment.

## 2. Vocational Expert Testimony

Eckenrode argues that the ALJ failed to describe with specificity all of her demonstrated impairments in his hypothetical to the VE, thereby failing to consider all limitations in determining his residual functional capacity. (D.I. 12 at 5-6) The Third Circuit has held that "[a] hypothetical question must reflect *all* of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004) (internal quotations omitted) (emphasis in original) (quoting *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)). In *Ramirez*, the court found that the ALJ's hypothetical that excluded the plaintiff's limitations regarding concentration, persistence, or pace was deficient. *See id.* at 554.

However, the Third Circuit has also recognized that in order "to accurately portray a claimant's impairments, the ALJ msut include all '*credibly established limitations*' in the hypothetical." *Zirnsak*, 777 F.3d at 614 (emphasis in original). "[L]imitations that are supported by medical evidence and are 'otherwise uncontroverted in the record' *must* be included in the ALJ's hypothetical for us to rely on the VE's response to that hypothetical." *Id.* (emphasis in original). If a limitation is supported by medical evidence, but opposed by other evidence in the record, "the ALJ has discretion to choose whether to include that limitation in the hypothetical." *Id.* at 615. "[T]he ALJ also has the discretion to include a limitation that is not supported by any medical evidence if the ALJ finds the impairment otherwise credible." *Id.*

Here, Eckenrode's limitations outlined in Dr. Dermen's report were controverted by other evidence in the record, and it was, therefore, properly within the ALJ's discretion whether to submit the limitations to the VE. *See id.* For example, Dr. Dermen opined that Eckenrode was limited to lifting up to ten pounds occasionally, sitting three to four minutes at one time, and

sitting seven to eight minutes at one time. (D.I. 9-19 at 71) However, Eckenrode consistently showed normal strength, posture, gait, and coordination. (D.I. 9-2 at 43; D.I. 9-19 at 11, 21) Furthermore, Eckenrode reportedly engaged in community service monthly and was able to make her bed, do laundry, and take care of her personal care tasks. (D.I. 9-9 at 41-42, 44) Therefore, the ALJ properly exercised his discretion to exclude the limitations outlined in Dr. Dermen's report in his RFC finding.

### 3. The ALJ's Discussion of the Medical Evidence Began at the Amended Alleged Onset Date

Eckenrode avers that the ALJ's discussion of the medical evidence contains "significant gaps." (D.I. 12 at 13) In support of this assertion, Eckenrode cites instances of continued headaches in November 2010 and June 2011, which the ALJ did not discuss. (*Id.* at 13-14) Therefore, Eckenrode concludes, the ALJ's rationale for rejecting Dr. Dermen's opinion reflects a highly selective review of the medical evidence of record. (*Id.* at 14) The amended alleged onset date is October 1, 2013, and the instances that plaintiff cites precede this onset date. (D.I. 9-2 at 64; D.I. 12 at 13-14) Plaintiff does not cite any legal authority that requires the ALJ to ascribe weight to medical evidence that issued before the amended alleged onset date. *See Labrador v. Berryhill*, 2019 WL 2611146, at *12 (D.N.J. June 26, 2019) (citing *Sommerfeld v. Astrue*, 2011 U.S. Dist. LEXIS 146322, at *13 (E.D. Wash. Dec. 9, 2011) ("Because this evidence related to a period of time before alleged onset, the Commissioner is correct that it was not probative and the ALJ was not required to discuss it.")). Therefore, the court recommends rejecting plaintiff's argument on this point and denying Eckenrode's motion for summary judgment.

## V.    CONCLUSION

For the foregoing reasons, the court recommends denying Eckenrode's motion for

summary judgment (D.I. 11) and granting the Commissioner's cross-motion for summary

judgment (D.I. 13).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R.

Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections

within fourteen (14) days after being served with a copy of this Report and Recommendation.

Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10)

pages each. The failure of a party to object to legal conclusions may result in the loss of the right

to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1

(3d Cir. 2006*)*; *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R.

Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website,

http://www.ded.uscourts.gov.

Dated: January $\underline{28}$ , 2020

Sherry R. Fallon
United States Magistrate Judge